**Bobby Wayne COLLINS, Appellant,**

v.

**The STATE of Oklahoma, Appellee.**

**No. F–75–474.**

Court of Criminal Appeals of Oklahoma.

March 17, 1977.

Rehearing Denied April 5, 1977.

Stephen Jones, Enid, for appellant.

Larry Derryberry, Atty. Gen., Bill J. Bruce, Asst. Atty. Gen., for appellee.

## OPINION

BUSSEY, Presiding Judge.

Appellant, Bobby Wayne Collins, hereinafter referred to as defendant, was charged in the District Court, Woodward County, Case No. CRF–74–53, for the offense of Murder in the First Degree, in violation of 21 O.S.Supp.1973, § 701.1, ¶ 8. After a change of venue to Garfield County, he was tried by a jury and convicted, and in accordance with 21 O.S.Supp.1973, § 701.3, he was sentenced to death. From said judgment and sentence a timely appeal has been perfected to this Court.

The crime out of which this case arose was indeed a terrible one. Four people— the entire Thrasher family of Woodward, Oklahoma—were shot and killed in their own home. The bodies were discovered by Bob Patee, a co-worker of Mervin Thrasher, who testified at the trial that on September 2, 1974, he had twice called Mr. Thrasher to come to work. The first time Patee called was at approximately 4:30 in the morning, at which time Thrasher went to work and helped Patee repair an engine. The second time, around 8:00 a. m., Thrasher told Patee that he could not come to work for a couple of hours, and then never did show up; but, since it was the Labor Day holiday and employees were not required to work overtime, Patee did not find this particularly unusual. However, when Thrasher did not come to work the next day and did not answer the telephone, Patee decided to stop by the Thrasher residence after work. He arrived at the house about 10:30 p. m. on September 3, 1974. The house was dark, but with the aid of a flashlight he began looking through the windows until he saw the body of Mrs. Thrasher lying on the floor.

Patee went immediately to the police, and when investigators entered the house they found both Mervin Thrasher, age 28, and his wife Sandra, age 27, lying face down on the bedroom floor. Mervin Thrasher's feet were tied together and his hands were bound behind his back. He had been shot in the head three times. Sandra Thrasher was tied in a similar fashion, but with her feet pulled up and tied to her hands. She had been shot in the head twice. The two Thrasher children were in bunk beds in the same room: 18-month-old Robert in the bottom bed, shot twice in the head, and 5-year-old Penelope in the upper bed, shot three times in the head.

Although the murder weapon was never recovered, investigation indicated that all four persons were shot with a .22 rifle

belonging to Thrasher, since shell casings found in the bedroom matched casings found at the Thrasher's former residence in Guymon, Oklahoma. Mervin Thrasher had reported the rifle stolen a week before, when someone had entered the house during the day while no one was at home, and had taken the rifle and some other things. The defendant confessed to the burglary, but he maintained that there was a second person involved, and that he had not been in town on the day of the murders.

The defendant testified that on August 27—six days before the crime took place—he had borrowed a car from his cousin and had gone to Enid in a vain attempt to find a new job. The cousin, however, denied loaning his car to the defendant on that date. The defendant said that on the way back to Woodward he picked up a hitchhiker who said his name was Jerry. The defendant learned his last name to be Prowess by looking at the identification card on his backpack. The hitchhiker asked to spend the night, to which the defendant agreed. Defendant dropped Prowess off at his house, returned his cousin's car, and went to work at the 24-hour truck stop where he worked the night shift. The next morning when he returned home, Prowess was not there. Defendant went to sleep, but was awakened about noon by Prowess who wanted him to "go look at a house." The two of them walked to a rural residence just outside of town and entered through the back door, which was unlocked. They stole a number of items, including a rifle, and then started back to town. They hid the rifle so that they would not be seen walking through town with it. That evening Prowess left, taking some of the stolen items, and the defendant said that he never saw him again.

Defendant testified that on the day of the crime he got off work at 6:30 a. m. He had just bought a car three days before, and he immediately left town with the intention of visiting his brother in Canadian, Texas. However, being unfamiliar with northwestern Oklahoma, he took a wrong turn and wound up near the Kansas border.

At this point he abandoned his intention of going to Texas, and returned to Woodward. When he got back—at about 9:15 a. m.—he went to Gibson's Discount Store and bought a pair of tennis shoes. Although the tread on the shoes matched prints found at the Thrasher home, the defendant introduced into evidence a price tag and cash register tape from Gibson's to show that he had bought the shoes after the murders were committed. The tape did not name specific items sold, but it did show a sale with the same price as his shoes from the Shoe Department. Since Gibson's did not open until 8:55 a. m., the purchase would not have been made until after the murders were thought to have been committed.

An agent from the Oklahoma State Bureau of Investigation assigned to the case testified that in the course of the investigation the defendant gave several inconsistent statements after having been fully informed of his rights in each instance. At first he did not admit to having participated in the burglary, saying only that Prowess had come back to his house on the 28th with cigarettes, a shaver and a rifle, and that Prowess had left on Sunday, September 1, 1974. Later, he admitted taking part in the burglary, and still later he told the agent that he had gone to the Thrasher home on the day of the murders, but had left the house before Prowess fired any shots. He said that Prowess threatened to kill him if he told anyone, and that he took Prowess to the edge of town and let him out of his car. The agent also testified that at one point the defendant made some incriminating statements, saying "I see them in my sleep at night, . . . My God that little girl was still asleep, . . . the kids I can't get them out of my mind, that little boy just looked at the gun." (Tr. 874–875) The defendant denied saying that the little girl was asleep, and said that the OSBI agent had previously stated to him that the boy must have been looking at the gun, and that when he became upset during questioning he had merely repeated it back. The prosecutor argued that the defendant's stories contained material which no one but the killer could know, but the defense con-

tended that because of rumor and excessive media coverage everything the defendant had said had been in public circulation.

█ The defendant's first assignment of error is that the evidence was insufficient to sustain the conviction of murder in the first degree, either on his own or by aiding and abetting the alleged hitchhiker. Both parties argued the question at length, but the rule of this Court is clear with regard to the sufficiency of the evidence:

> "While much of the evidence is circumstantial, this Court has often held a criminal case may be proved circumstantially and reasonable inferences drawn therefrom have the same probative effect as direct testimony. *Young v. State,* Okl. Cr., 373 P.2d 273. Additionally, circumstantial evidence need not exclude every hypothesis or negate any possibility other than guilt. *Bailey v. United States,* 410 F.2d 1209 (10th Cir. 1969). And finally, it is the exclusive province of the jury to weigh the evidence and determine the facts. *Jones v. State,* Okl.Cr., 468 P.2d 805; and where there is competent evidence from which the jury might reasonably conclude the defendant is guilty, the case will not be reversed on appeal on a contention that the evidence is not sufficient. *Brewer v. State,* Okl.Cr., 452 P.2d 597." *Logan v. State,* Okl.Cr., 493 P.2d 842, 846 (1972).

█ The defendant cites *Staples v. State,* Okl.Cr., 528 P.2d 1131 (1974), as holding that to convict on circumstantial evidence alone, every reasonable hypothesis except guilt must be excluded. But in that case involving possession of marihuana, we also said that such possession could be inferred if there were "additional independent factors showing knowledge and control." Among such factors we included incriminating statements or conduct on the part of the accused. In the instant case, the circumstantial evidence implicating the defendant taken together with the testimony of the OSBI agent as to the statements made by defendant was sufficient to support the verdict of guilty. The defendant also cites *Cole v. State,* Okl.Cr., 467 P.2d 511

(1970); however, the situation in that case was extreme, as the State failed to introduce evidence available to it which could have verified or negated the possibility that the victim in that case committed suicide rather than having been murdered. In the case at bar the record does not indicate any similar flagrant deficiency, and we do not find any grounds which would justify interfering with the jury's function.

The defendant next assigns as error that the trial court refused the defendant's requested instruction on murder in the second degree. Title 21 O.S.Supp.1973, § 701.2, defines murder in the second degree as follows:

> "1. When perpetrated without authority of law, and with a premeditated design to effect the death of a person, or of any other human being, but by an act not enumerated in the preceding section;
>
> \* \* \* \* \* \*
>
> "3. When perpetrated without any design to effect death by a person engaged in the commission of any felony other than the felonious acts set out in Section 1 of this act." (Footnote omitted)

The defendant suggests that the evidence presented at trial would justify an inference that the defendant went to the Thrasher residence with the intent to burglarize the house, and argues that paragraphs 1 and/or 3, above, could be relevant as burglary is not one of the crimes listed in Section 701.1 as supporting a charge of murder in the first degree.

█ We note first of all that the defendant is arguing instructions with regard to felony murder, while that is not the crime with which he was charged. However, even if there were a question of felony murder the underlying felony in this case would probably not be burglary, but armed robbery which falls under Section 701.1, paragraph 2. It is flimsy at best to argue that there might be a lack of premeditation where a man, his wife, and their two small children were shot to death in the manner in which the Thrasher family was killed. Such circumstances raise a presumption of

premeditation, 21 O.S.1971, § 702, and the defendant presented no evidence to counter that presumption.

■ The actual charge in the case was under 21 O.S.Supp.1973, § 701.1, ¶ 8, which includes in murder in the first degree any homicide "perpetrated against two or more persons arising out of the same transaction or occurrence or series of events closely related in time and location." The defendant was charged with "mass murder." If the jury believed that he killed two, three or four members of the Thrasher family, then he would be guilty of murder in the first degree regardless of his reason for going to the Thrasher house that day. And, if the jury believed that he killed one of the four, or none, then they could only render a not guilty verdict. Thus, the trial court was correct in not giving an instruction on murder in the second degree. Compare, *Sanders v. State*, Okl.Cr., 556 P.2d 611 (1976), in which we similarly interpreted Section 701.1, paragraph 2, with regard to armed robbery.

■ The defendant's third assignment of error is that photographs of the Thrasher family admitted into evidence were gruesome and served no purpose save to arouse the emotions of the jury. The general rule is that the admission of photographs rests within the sound discretion of the trial court. *Mott v. State*, 94 Okl.Cr. 145, 232 P.2d 166 (1951), and *Jackson v. State*, 67 Okl.Cr. 422, 94 P.2d 851 (1939). If the photographs are gruesome and there is a possibility of prejudice to the jury, then they will not be admissible unless their probative value clearly outweighs the danger of prejudice. *Born v. State*, Okl.Cr., 397 P.2d 924 (1964). In the case at bar, the trial court held a hearing outside the presence of the jury to determine the admissibility of the photographs, and some were in fact not admitted.

■ The defendant cites *Oxendine v. State*, Okl.Cr., 335 P.2d 940 (1958), in which we held photographs of the murder victim inadmissible. However, the photographs in that case were taken after an autopsy had been performed, and any possible probative value was heavily outweighed by the probability of creating prejudice in the minds of the jury. In this case, however, all the photographs were of the actual crime scene, and thus had definite probative value. Particularly material were the photographs of Mr. and Mrs. Thrasher, which reveal that they had been found tied and shot. The photographs were unquestionably an aid to the jury in arriving at the ultimate conclusion that the homicides were committed with the premeditated design of killing two or more persons. We do not feel that the pictures were of such a nature as to be inadmissibly gruesome.

The defendant argues that the manner in which the Thrashers died was not in contention, and that the photographs were not "relevant" to his defense of alibi. In *Pate v. State*, Okl.Cr., 361 P.2d 1086 (1961), this Court speaking through Brett, J., confronted with a similar argument stated:

"As was said in *State v. Evans*, 145 Wash. 4, 258 P. 845, 846:

"'That one party has admitted a fact does not estop the other party to prove the fact by means of relevant evidence, inasmuch as facts when admitted, frequently lose their probative force.'

"Unless the State agrees to stipulate on a matter, there can be no valid stipulation. If such were not true, the defense could lay down the guage of battle and set the pattern for the prosecution. But we know of no law that requires the State to abdicate its right to try its side of a lawsuit as it sees fit, and not subject to the dictates of the defense, so long as its conduct is in keeping with the requirements of law."

We hold that in the instant case it cannot be said that the trial court abused its discretion in allowing the admission of the photographs.

■ The defendant's fourth assignment of error concerns a demonstration made by the prosecuting attorney in closing argument. Over the defendant's objection, the prosecutor produced material "similar" to that with which Mervin Thrasher was

bound, and demonstrated that it was possible for a person to bind himself. The defendant argued that this demonstration was error in that the prosecuting attorney went outside the record and in that the defendant was denied his Sixth Amendment right of confrontation, since the fact objected to was put before the jury in such a way and under such circumstances that the defendant was given no opportunity of disproving it or of cross-examining the witness who testified to it. We have always held that a liberal freedom of speech is implicit in the right of argument, and that counsel for both sides are to be allowed a wide range of discussion, illustration and argumentation. Counsel on both sides have a right to discuss the evidence from their individual points of view, including inferences and deductions which may be drawn therefrom. This precise question does not seem to have arisen before in this jurisdiction, but such demonstrations have been ruled proper in other states. In *Herron v. Commonwealth*, 23 K.L.R. 782, 64 S.W. 432 (1901), the prosecuting attorney used a live model and an unloaded pistol during closing argument to demonstrate that shots could not have been fired in the manner claimed by the defendant in the case. The Kentucky Court of Appeals in that case said:

" . . . The illustration made was from what [the Commonwealth's attorney] claimed to be the evidence in the case, and he certainly had the right to do so. It was not in the nature of introduction of testimony, but an effort to make an application of that which had been introduced. . . . "

In *Russell v. State*, 66 Neb. 497, 92 N.W. 751 (1902), the prosecuting attorney used a piece of crayon to show how a revolver's defective muzzle could have deformed a bullet fired from the pistol. The revolver and a bullet found in the body of the deceased were in evidence, and the defendant's attorney had argued that the defect in the bullet and the one in the pistol were so dissimilar as to prove that the fatal shot had not been fired from that pistol. The prosecuting attorney forced a piece of crayon into the muzzle of the pistol during closing argument to show a correspondence in the defects. The Nebraska Supreme Court said:

" . . . In our opinion, the conduct complained of was entirely proper. The crayon was an argument, and a perfectly legitimate one. After being forced into the muzzle of the revolver, it conveyed to the jury an idea, which language, at best but an imperfect vehicle of thought, could not so well convey. There is, we believe, no rule of law which limits counsel in debate to mere articulation. . . . "

The Supreme Court of Appeals of Virginia held in *Peoples v. Commonwealth*, 147 Va. 692, 137 S.E. 603 (1927), that it was proper for the commonwealth's attorney to borrow a revolver from an officer in the courtroom to demonstrate that it would have been impossible for the deceased to have inflicted the fatal wounds upon herself:

" . . . Argument by means of illustration, such as exhibiting to the jury models, tools, weapons, implements, etc., is a matter of every day practice. . . A discretion is vested in the trial court to prevent an abuse of the use of such illustrations, and unless there has been such an abuse, this court will not interfere. . . . " (Citations omitted)

In *People v. Freeman*, 107 Cal.App.2d 44, 236 P.2d 396 (1951), the defendant was charged with starting grass fires, and the District Attorney in argument to the jury lit several kitchen matches and threw them across the courtroom to show that they would continue to burn. The defendant, on appeal, objected that conditions in the courtroom were not the same as conditions in the mountains where the fires were started. The court, in refusing to find prejudicial error, noted that the demonstration was for illustrative purposes only, and that there was no claim that conditions were similar. In *State v. Roy*, 220 La. 1017, 58 So.2d 323 (1952), the District Attorney on closing argument brought into the courtroom a "large device or contraption" to illustrate the path of bullets fired from the murder weapon in order to refute the de-

fendant's theory of accidental shooting. The Supreme Court of Louisiana cited *Herron v. Commonwealth*, supra, among other cases, in finding no error in the use of the device. In *People v. Caldaralla*, 163 Cal. App.2d 32, 329 P.2d 137 (1958), the Court found no error in a demonstration during argument involving a live model. The prosecuting attorney attached arrows to the model's suit to show where bullets had struck the victim, and had him fall down and roll on the floor in an attempt to demonstrate that some of the bullets had struck the victim after he had fallen. And finally, in *Barber v. Commonwealth*, 206 Va. 241, 142 S.E.2d 484 (1965), the prosecuting attorney used a toy pistol to prove that the fatal wound could not have been inflicted as the defendant claimed. The Virginia Supreme Court found no error in this even though the toy pistol was not shown to be the same size or type as the murder weapon, noting that:

> "It was within the sound discretion of the trial court to determine whether the use of the toy pistol for purposes of demonstration should be permitted. . . ."

■ In the instant case the actual bindings were in evidence, but could not be used in the demonstration because they had been cut in order to be removed from the victim. Counsel for the defense had suggested during opening argument that the evidence would not support the contention that one person could have done all that was done, and the purpose of the demonstration was to show that Mervin Thrasher could have bound himself. Counsel for the State did not claim that Thrasher had in fact tied himself in such a manner, but sought only to show that it was possible for a person to bind oneself. This was a legitimate comment on the evidence, and we find no error.

■ In his fifth assignment of error, the defendant contends that it was error for the trial court to refuse to order the State to permit inspection of reports received from law enforcement agencies in other states concerning the possible existence of the hitchhiker, Jerry Prowess. In the course of the investigation the State sent inquiries to the driver registration bureaus of all 50 states and the District of Columbia and to the Internal Revenue Service, asking for any information on a person named Jerry Prowess. The defendant filed a motion "to compel disclosure of all evidence favorable to defendant," and sought among other things to discover the letter sent and all replies. The defendant argues from *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and from *Stevenson v. State*, Okl.Cr., 486 P.2d 646 (1971), that the State must disclose to the defendant any materials in its possession which would tend to exculpate the defendant.[1] This argument is correct. However, in *Stevenson* we also said:

> " . . . It is of doubtful wisdom to reverse a conviction upon the mere speculation the prosecution may have had some material favorable to defendant. . . ." 486 P.2d at 650

In the instant case the defendant claimed to have picked up the hitchhiker on his way back from Enid, while the owner of the car testified that he had not loaned the defendant his car that day. All replies to the inquiry in question were negative and inconclusive except for the reply from New Jersey, saying that they had a record of a person named Jerry Prowell. The defendant argues that Jerry Prowess and Jerry Prowell might be the same person, and that if he had known of the reply he might have been able to track down that person who might have been the alleged Jerry Prowess. In view of the fact that it was disputed whether or not the defendant even went to Enid on that day, the chain of speculative possibilities here is too long to support the defendant's argument of prejudice. In any

---

1. The rule of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), has been recently modified in *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), which we have considered at length in *McDonald v. State*, Okl.Cr., 553 P.2d 171 (1976). Neither case is pertinent here, as both cases involved situations in which the defendant had not made a specific request for specific material, while the defendant in the instant case specifically requested the replies to the State's inquiry on Jerry Prowess.

event, the name Prowell and Prowess are so dissimilar as to negate any reasonable possibility that Prowell and Prowess are one and the same person. The defendant cites *Dennis v. United States*, 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966), as saying that a determination as to whether material may be useful to the defense can only be properly made by an advocate. Within the context of that case, however, the Supreme Court was dealing with the disclosure of grand jury testimony, which is ordinarily kept confidential. The statement quoted by the defendant in this case was made with reference to the suggestion that the trial court could make an in camera inspection to determine whether there were sufficient inconsistencies between the testimony of witnesses before the grand jury and at trial to justify disclosure of the grand jury testimony for impeachment purposes. The Supreme Court felt that an undue burden would be placed upon the trial court by the requirement of reading volumes of testimony. It said that *upon a proper showing of need* all testimony should be disclosed to the defendants, who could then read it for themselves to see if there were any inconsistencies. The Court at no point said that a defendant can gain access to material possessed by the state simply by demanding it. Since it does not appear that the State suppressed any evidence in its possession which tended in anyway to exculpate the defendant, or to strengthen his defense, we find this assignment of error to be without merit.

 As his sixth assignment of error, the defendant raises the trial court's refusal to instruct the jury on abandonment of the scheme. His argument is based on the prior inconsistent statement made to the investigating agent from the OSBI, in which according to the agent's testimony the defendant told of going to the Thrasher home with Jerry Prowess on the day of the murder. In this story the defendant said that Jerry Prowess held a gun on the

Thrashers while the defendant tied Mervin Thrasher. He testified that several times the defendant said "let's get out of here," and that after Mr. Thrasher was tied Prowess told the defendant to get the car, at which point defendant ran from the house, hearing gunshots after he had left. The defendant contends that if the jury had believed this story they might have been able to find that the defendant had abandoned the scheme, and hence was not guilty of the murders. This contention is without merit, however, because in order to successfully abandon the scheme that party must communicate to the others involved his intention to do so. In the story told to the agent of the Oklahoma State Bureau of Investigation, the defendant at no point told Jerry Prowess he was withdrawing; he left only upon Prowess' instruction to get the car. There was no error.

 The next three assignments of error pertain to the selection of the jury. The defendant argues that it was improper to exclude from the jury all those who expressed conscientious scruples as to the death penalty, and that such a procedure deprived the defendant of his right to a jury which reflected a representative cross-section of the community and resulted in a prosecution prone jury. We have dealt with this question previously in *Justus v. State*, Okl.Cr., 542 P.2d 598 (1975), where we held that under 21 O.S.Supp.1973, § 701.3, it is not only permissible but necessary to inquire as to the jurors' feelings on the death penalty. The defendant argues that such exclusion is improper under *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), and urges us to overrule *Justus* as being inconsistent with the holding in that case. But, as we noted in *Justus v. State*, supra, the ruling in *Witherspoon* is distinguishable, since the jury under the Illinois statute had the option of giving life imprisonment or the death penalty, while in Oklahoma the jury had no such option.[2] Reviewing the record

2. We note that under the new provisions for punishment for murder—21 O.S.Supp.1976, § 701.9—juries in Oklahoma will have the option of giving the death penalty or life impris-

onment, and *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), will be controlling.

of the voir dire, we find no error in the questioning.

█ The defendant's tenth, eleventh and twelfth assignments of error relate to the pretrial proceedings. He argues that the demurrer to the information should have been sustained, that the evidence presented at the preliminary hearing was insufficient to justify his being bound over, and that in being bound over he was denied equal protection of the law, in violation of the Fourteenth Amendment of the United States Constitution. Title 22 O.S.1971, § 404, provides than an information shall charge one offense only, and the defendant argues that since the information in his case alleged the murders of all four members of the Thrasher family it was in violation of this statute; that each of the killings should be considered a separate crime. However, the information was filed under 21 O.S.Supp.1973, § 701.1, ¶ 8, the "mass murder" provision, and as we stated earlier all four killings go to make up one mass murder. All were properly listed in one charge because the separate killings were the different acts which, combined, constitute one offense under the statute.

█ With regard to the evidence presented at the preliminary hearing, the defendant contends that it was insufficient to bind him over on a charge of murder in the first degree, that the charge should have been reduced to murder in the second degree and/or manslaughter in the first degree, and that the trial court erred in overruling the defendant's motion to quash and dismiss the information. After reviewing the evidence presented at the preliminary hearing we find no error in these regards: The footprints running from the house to the road matched the defendant's sneakers, the defendant had confessed to the burglary in which the murder weapon had been taken and his alibi was uncorroborated. We hold that the examining magistrate was justified in binding the defendant over on a charge of murder in the first degree.

█ The defendant also argues that it is a violation of the equal protection clause not to require "the same quantum of evidence to hold one for trial by information as for indictment." We have repeatedly held that prosecution by indictment and by information are alternative remedies available to the State, *In re McNaught,* 1 Okl.Cr. 528, 99 P. 241 (1909); *Stone v. Hope,* Okl.Cr., 488 P.2d 616 (1971); and that the State commits no violation of the Fifth or Fourteenth Amendments to the United States Constitution by electing one over the other, *Sisson v. State,* Okl.Cr., 426 P.2d 379 (1967); *Stevenson v. State,* supra. This covers equal protection as well as due process. The underlying concept of the equal protection clause is that of discrimination. The clause was designed to protect a person or class from being singled out as the subject of hostile or discriminatory legislation. In order to raise a claim under this doctrine a person must be able to show that he or she is a member of a class which has in fact been set apart by action of the legislature. This the defendant has not done. The procedural statutes challenged here—22 O.S. 1971, §§ 264 and 336 do not in fact create any classifications. The defendant argues that he is in the class of those prosecuted under Section 264 as opposed to those prosecuted under Section 336, but this is fallacious. Provision for alternate remedies is not discrimination just as provision for alternative prosecutions (where one act may constitute more than one offense) is not discrimination.

█ Lastly, the defendant contends that Oklahoma's mandatory death penalty is unconstitutional. That penalty has, in fact, been declared unconstitutional by the United States Supreme Court. In *Riggs v. Branch,* Okl.Cr., 554 P.2d 823 (1976), we considered the impact of this ruling upon the Oklahoma murder statutes, and we held there that those persons sentenced to death under 21 O.S.Supp.1973, § 701.3, should have their sentences modified to life imprisonment. Accordingly, we do so here.

**1384**

Having considered all assignments of error raised by the defendant, and finding none which would merit reversal, it is the order of this Court that the sentence of death be *MODIFIED* to life imprisonment, and that the judgment and sentence in the case otherwise be *AFFIRMED* as modified.

BLISS, J., concurs.

BRETT, J., dissents.

BRETT, Judge, dissents:

I would reverse and remand for new trial on three grounds: First, that the trial court should have given an instruction on Murder in the Second Degree; second that the prosecutor's demonstration in closing arguments was improper; and, third that the State improperly withheld exculpatory evidence from the defendant.

This Court has held previously that where there is any evidence tending to prove a lesser and included offense an instruction on that offense must be given. See, *Williams v. State,* Okl.Cr., 513 P.2d 335 (1973), and *Laymon v. State,* Okl.Cr., 513 P.2d 883 (1973). The defendant was charged under 21 O.S.Supp.1973, § 701.1, with Murder in the First Degree.[1] From evidence in the case, the defendant's testimony, unexplained footprints, and unexplained cigarette butts bearing saliva not identifiable to any of the victims, or the defendant, the jury might have determined that there was at least a reasonable doubt as to whether the defendant had either killed the victims himself or aided and abetted another person in killing the victims, according to the provisions of Section 701.1, paragraph 8. If so, they might have determined that the defendant was guilty of Murder in the Second Degree, either because it was perpetrated by an act imminently dangerous to others and evincing a depraved mind, regardless of

human life, although without any premeditated design to effect the death of any particular individual; or because it was perpetrated without any design to effect death by a person engaged in the commission of any felony other than the felonious acts set out in Section 701.1. The State put on evidence indicating that the defendant had committed the offense of breaking and entering on the day in which the homicides occurred, but breaking and entering is not one of those felonies listed in 21 O.S.Supp. 1973, § 701.1. As we stated in *Williams v. State,* Okl.Cr., 542 P.2d 544, 582 (1975), later overruled on other grounds in *Riggs v. Branch,* Okl.Cr., 554 P.2d 823 (1976):[2]

". . . To the extent that instructions upon appropriate lesser included offenses are not submitted, the jury would not have the opportunity to consider whether the defendant might only be guilty of a less serious crime, and he would thereby effectively be deprived of his right to a full and complete trial by jury. . . ."

In the instant case, the jury was faced with the choice of finding the defendant guilty of murder in the first degree or finding him guilty of nothing. There was evidence presented that the defendant might have been guilty of a less serious crime than murder in the first degree, and to that extent he was denied a fair trial by jury.

Regarding the demonstration by the prosecuting attorney in the closing argument, the cases cited by the majority in this opinion, while by no means binding this Court to allow such a demonstration, do indicate that in some jurisdictions considerable latitude has been allowed the prosecutor in closing argument. Nevertheless, I think that the demonstration by the prosecutor was extremely prejudicial to the defendant, because the prosecutor made it appear that it would have been a simple task for Mervin

1. Title 21 O.S.Supp.1973, § 701.1, states in part: "Homicide, when perpetrated without authority of law and with a premeditated design to effect the death of the person killed, or any other human being, is murder in the first degree in the following cases:
\* \* \* \* \* \*

"8. When perpetrated against two or more persons arising out of the same transaction or occurrence or series of events closely related in time and location."

2. In this case, however, we found that no evidence was presented which tended to show the commission of a lesser crime than Murder in the First Degree.

Thrasher to have tied his own wrists and then to have stepped over them so that his hands would be tied behind him. The defendant was given no opportunity to discover and point out to the jury that the prosecuting attorney had in fact practiced the demonstration in his motel room. As a result, the jury may well have been misled as to what the demonstration actually had shown.

Finally, I would reverse on the ground that the State suppressed evidence which was exculpatory to the defendant. Prior to the trial, the defendant properly moved to compel disclosure of all evidence favorable to the defendant, including "copies of all memorandums, reports and summaries used by the plaintiff, the State of Oklahoma, or any of its agents, representatives, or assigns, to determine the possibility of the hitchhiker described by the defendant as Jerry Prowess, or to eliminate the possibility of such hitchhiker, described by the defendant, including but not limited to the following:

a) Copies of all form letters testified to at the preliminary hearing by Sid Cookerly sent to other states by the OSBI together with the return information supplied by such states.

b) Copies of all wire messages sent to any police agency or department of motor vehicle registration concerning Jerry Prowess, together with the results of such inquiries.

c) Any and all reports dealing with the investigation or inquiries made concerning the existence or nonexistence of Jerry Prowess, or any other hitchhiker.

The Canons of Professional Responsibility places a high standard on a public prosecutor. DR 7–103(B) states:

"A public prosecutor or other government lawyer in criminal litigation shall make timely disclosure to counsel for the defendant, or to the defendant if he has no counsel of the existence of evidence, known to the prosecutor or other government lawyer, that tends to negate the guilt of the accused, mitigate the degree of the offense, or reduce the punishment."

The United States Supreme Court has held that it is a denial of due process, and therefore reversible error, for the State to withhold evidence favorable to a defendant after a request by the defendant, where the evidence is material. See, *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); *Demarco v. United States,* 415 U.S. 449, 94 S.Ct. 1185, 39 L.Ed.2d 501 (1974); *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *Moore v. Illinois,* 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972); and, *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Here, the evidence had been requested properly by the defendant prior to trial. Furthermore, the evidence was material in that it related to the defense which the defendant was trying to establish. Had the defendant been privy to the information received by the State, he might have found the putative hitchhiker, and he might well have been able to establish his defense, at least as to the charge of Murder in the First Degree. Therefore, the evidence was exculpatory.

On these grounds I respectfully Dissent.

### OPINION ON REHEARING

The Appellant was sentenced to death for the offense of Murder in the First Degree, in violation of 21 O.S.Supp.1973, § 701.1(8), in the District Court, Garfield County. On Appeal that sentence was modified to life imprisonment and affirmed as modified by opinion of this Court rendered in the above styled and numbered cause on March 17, 1977. A Petition for Rehearing has been timely filed.

In his petition, the appellant raises four grounds which he argues merit a rehearing of the cause. However, after careful consideration of the arguments, we are of the opinion that the petition should be denied.

The Appellant first urges that he was entitled to an instruction on Murder in the Second Degree because the evidence, if believed, tended to show that he was outside the death home at the time the fatal

shots were fired. Title 21, O.S., § 172 provides that all persons "concerned in the commission of crime . . ." whether or not they directly commit the act constituting the offense, and even though not present, are principles in the crime, and triable as such. Neither the fact the appellant was outside the home, nor the fact that the trial court gave an instruction on accomplices acts to negate the appellant's liability as a principle for the murder of the Thrasher family. The record shows that the jury was properly instructed on the need for premeditation for a finding of guilt of First Degree Murder, and from their verdict we must conclude that they did find the requisite premeditation.

 The Appellant next argues that as a result of *Davis v. Georgia*, 429 U.S. 122, 97 S.Ct. 399, 50 L.Ed.2d 339 (1976) we must overrule our holding in *Justus v. State*, Okl.Cr., 542 P.2d 598 (1975), that 21 O.S. Supp.1973, § 701.1, et seq., was not governed by *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). The holding of *Witherspoon* and *Davis* is that a prospective juror cannot be excluded from the jury unless he or she is "irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings." *Witherspoon,* supra. The Court in *Davis* stated that if a prospective juror is improperly excluded under such a test, then "any subsequently imposed death penalty cannot stand." Since in the present case we have already modified the appellant's sentence to life imprisonment, this ground for rehearing is without merit.

The Appellant's third contention is that there is an unconstitutional conflict between the statutes providing for prosecution by indictment and by information. We have considered this contention in our original opinion in this case, and the appellant raises no new matter in this regard.

And, finally, the appellant asks for a rehearing on the issue of disclosure by the State of evidence within its possession, arguing that reports received from law enforcement agencies in other states were clearly exculpatory, and as such should have been disclosed to the appellant before trial. He suggests that in our original opinion we applied the wrong test, and cites to us *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). However, the appellant has apparently misunderstood our opinion. *Chapman v. California,* supra, established the original harmless error rule to be applied to Federal Constitutional errors; however in our opinion where we stated that "the chain of speculative possibilities here is too long to support the defendant's argument of prejudice" we did not mean that the lack of prejudice made the error harmless; we meant that the defendant's argument was too speculative to support the allegation of error.

For the foregoing reasons we are of the opinion, and so hold that the Petition for Rehearing is without merit, and the clerk of this Court is directed to issue the Mandate forthwith.

BLISS, J., concurs.